**JUDGE KARAS** UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| NEW JERSEY CARPENTERS PENSION FUND, Individually and On Behalf Of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> H&R BLOCK INC., MARK A. ERNST, WILLIAM L. TRUBECK and JEFFERY W. YABUKI, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> **JURY TRIAL DEMANDED** |

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by H&R Block Inc. ("H&R" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.      This is a class action on behalf of all persons and entities who purchased or otherwise acquired the securities of H&R between February 24, 2004 and March 14, 2006, inclusive (the "Class Period"), and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      H&R provides tax preparation and other financial services to individuals and small to medium sized businesses.

3.      This action alleges that H&R's Class Period financial statements, disseminated in press releases and SEC filings, were materially false and misleading for two primary reasons:

a.      H&R improperly accounted for its state effective income tax rate, thereby materially overstating its revenues in 2004 and 2005, which caused its securities to trade at artificially inflated prices; and

b.      H&R derived a material portion of its revenues from the deceptive marketing of its Express IRA product. Such practices were inherently unsustainable, subjected H&R block to potential regulatory, civil and criminal liability, and posed an undisclosed risk to the Company and investors.

4.      Defendants were motivated to engage in the wrongdoing alleged herein so that H&R insiders, including defendant Yabuki, could sell their personally held H&R stock at artificially inflated prices. During the Class Period, H&R insiders sold a total of 1,941,118 shares of H&R stock for proceeds of $50,610,601.

5.      On February 23, 2006, after the close of ordinary trading, H&R issued a press release announcing that it would restate previously issued financial reports for 2004 and 2005, stating as follows in relevant part:

> As part of its ongoing work to remediate control weaknesses in its corporate tax function, the company said that it will restate its results for fiscal years 2005 and 2004, as well as previously reported quarterly results for fiscal 2006. The restatement pertains principally to errors in determining the company's state effective income tax rate, resulting in a cumulative understatement of its state income tax liability of approximately $32 million as of April 30, 2005. The company estimates that the restatement will result in a 7-cent decrease in earnings per share in fiscal 2005 and a 2-cent decrease in earnings per share in fiscal 2004. The company has not completed its analysis of the restatement adjustments, and, accordingly, the effects of the restatement on all prior periods are

2

preliminary and subject to change. These adjustments are also being reviewed with the company's registered public accounting firm. The company will report in amended filings with the Securities and Exchange Commission the further restatement of results for fiscal years 2005 and 2004, and restatements for the first two quarters of fiscal 2006 for the income tax adjustments.

6.      In response to this announcement, the price of H&R common stock dropped by 8.6% in one day, from $25.19 per share on February 23, 2006 to $23.01 per share on February 24, 2006, on unusually heavy trading volume.

7.      Then, on March 15, 2006, the office of the New York Attorney General announced the filing of a civil complaint, in New York State Supreme Court, alleging that H&R failed to disclose fees and expenses on the Company's "Express IRA" product to approximately 500,000 clients that signed up for the account. According to the lawsuit, the retirement accounts at issue generated more in fees for H&R than interest for the client account holders.

8.      In response to this announcement, the price of H&R common stock dropped by $1.37 per share, or 6.2%, to $20.63 per share, on unusually heavy trading volume.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts charged herein occurred in substantial part in this District and defendant does substantial business in this district. In addition, H&R stock trades on the New York Stock Exchange, based in this District. Moreover,

the New York Attorney General has filed a civil fraud action in New York Supreme Court stemming from circumstances related to the conduct alleged in this action.

12.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE.

## PARTIES

13.     Plaintiff New Jersey Carpenters Pension Fund purchased H&R common stock during the Class Period, as set forth in the certification, annexed hereto, and was injured economically as alleged herein.

14.     Defendant H&R is a Missouri corporation headquartered at 4400 Main Street, Kansas City, Missouri 64111.

15.     Defendant Mark A. Ernst served as H&R's Chief Executive Officer, President and Chairman of the Board during the Class Period.

16.     Defendant William L. Trubeck served as H&R's Chief Financial Officer during the Class Period.

17.     Defendant Jeffery W. Yabuki served as H&R's Chief Operating Officer from 2002 until December 2005.

18.     Defendants Ernst, Trubeck and Yabuki are collectively referred to herein as the "Individual Defendants."

19.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with

4

other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

20.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of H&R, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

21.     As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE during the Class Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become

materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.      The Individual Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with H&R, each of the Individual Defendants had access to the adverse undisclosed information about H&R's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about H&R and its business issued or adopted by the Company materially false and misleading.

23.      The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

24.      Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of H&R common stock by

6

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding H&R's business, finances, financial statements and the intrinsic value of H&R common stock; and (ii) caused plaintiff and other members of the Class to purchase H&R securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of H&R between February 24, 2004 and March 14, 2006, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, there were approximately 327 million shares of H&R common stock outstanding that were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by H&R or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by defendants' acts as alleged herein;

b.      whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of H&R; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### MATERIALLY FALSE AND MISLEADING
### STATEMENTS MADE DURING THE CLASS PERIOD

31.     On February 24, 2004, H&R issued a press release announcing the following results for its third quarter, ended January 31, 2004, stating in pertinent part as follows:

KANSAS CITY, Mo. – H&R Block Inc. (NYSE:HRB) today

8

reported net income of $106.7 million, or 59 cents per diluted share, and record revenues of $977.2 million for the third quarter ended Jan. 31.

Third quarter revenues increased 2 percent from $958.4 million last year. Third quarter net income declined $25.6 million or 19.3 percent compared with last year when the company reported third quarter earnings of $132.3 million, or 73 cents per diluted share. Third quarter 2004 results include a $17 million gain on sale of certain mortgage assets. Third quarter 2003 results include a $130.9 million gain on a similar transaction. Excluding the effect of these gains, third quarter net income increased $42.9 million or 80.2 percent over the prior year.

The profitable third quarter marks the first time in the company's history that it has reported a profit in each of the first three quarters of its fiscal year. H&R Block typically reports losses in its first and second quarters, and often in its third quarter as well, due to the seasonal nature of its tax and business services units.

32.     On March 16, 2004, H&R filed its quarterly report with the SEC for the third quarter on Form 10-Q. The report was signed by defendant Ernst. For the quarter, defendants reported revenues of $977,157,000, net income of $106,726,000 and diluted earnings per share of $0.59. Defendants represented that these, and other financial results contained in the Form 10-Q, fairly presented the Company's operations in the quarter, stating as follows in this regard:

In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows at January 31, 2004 and for all periods presented have been made.

33.     On June 9, 2004, H&R issued a press release announcing "record annual revenues and earnings," reporting the following results:

KANSAS CITY, Mo. -- H&R Block Inc. (NYSE: HRB) today reported record revenues and net income for both its fourth quarter and fiscal year ended April 30.

9

Fourth quarter revenues totaled $2.2 billion, a 14.8 percent increase over the fourth quarter last year. Consolidated net income for the quarter increased 16.4 percent to $575.6 million. Fourth quarter earnings per diluted share increased 19.2 percent to $3.23.

Fiscal year revenues increased 12.3 percent to $4.2 billion. Consolidated net income for the fiscal year increased 20.3 percent to $697.9 million. Earnings per diluted share increased 23.8 percent to $3.90, excluding a change in accounting principle. After the change in accounting principle, earnings per share increased 22.5 percent to $3.86. The company adopted Emerging Issues Task Force No. 00-21 (EITF 00-21) in its second quarter.

34.    On July 2, 2004, H&R filed with the SEC its annual report for the fiscal

year ended April 30, 2004, on Form 10-K. The report was signed by defendant Ernst. In addition,

as required by Section 302 of the Sarbanes-Oxley Act of 2002, the report contained certifications

signed by Ernst that attested to the purported accuracy of the financial statements contained in

the Form 10-K and that the Company's internal disclosure and financial reporting controls were

effective, stating as follows:

1.    I have reviewed this annual report on Form 10-K of H&R Block, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed

under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

35.     In the Form 10-K, in the section of the annual report titled Management's Discussion and Analysis of Financial Condition and Results of Operations, defendants reported revenues of $4,205,570,000, net income of $697,897,000 and diluted earnings per share of $3.86,

for the year. These results were reported "in accordance with generally accepted accounting principles ('GAAP')", according to the Form 10-K.

36.     The statements contained in the Company's press releases and SEC filings, as set forth above in ¶¶ 31-35, were materially false and misleading because they failed to disclose the following facts, among others:

a.     The Company had been improperly understating its taxes;

b.     H&R had been overstating its net income and earnings per share;

c.     the Company's financial results were not presented in accordance with GAAP;

d.     the Company's internal disclosure and financial reporting controls were not effective;

e.     H&R derived a material portion of its revenues from the deceptive marketing of its Express IRA product, by failing to disclose fees associated with the product. Such practices were inherently unsustainable, subjected H&R block to potential regulatory, civil and criminal liability, and posed an undisclosed risk to the Company and investors; and

f.     for the foregoing reasons, the Company's reported financial results deceived investors regarding the Company's true historical results and prospects.

37.     On August 24, 2004, H&R issued a press release announcing results for its first quarter, ended August 24, 2004:

> KANSAS CITY, Mo. -- H&R Block Inc. (NYSE: HRB) today reported a $44.1 million net loss for its first quarter, compared with earnings of $5.2 million last year.  Revenues totaled $482.7 million, a 2.6 percent decline from last year.  The company reported a loss of 26 cents per diluted share, compared to 3 cents of earnings last year.
>
> The decline in earnings was primarily due to decreased mortgage segment income and additional off-season costs associated with

expanding the company's tax business.

"The first quarter loss is in line with our internal expectations, and consistent with our annual earnings guidance range of $4 to $4.25 per share," said H&R Block Chairman and Chief Executive Officer Mark A. Ernst. "This quarter we also repurchased 7.5 million shares in accordance with our objective to return excess capital to shareholders.

38.     On September 8, 2004, H&R filed its quarterly report with the SEC for the quarter ended July 31, 2004. The report was signed by defendant Ernst. For the quarter, defendants reported revenues of $482,711,000, net loss of $44,083,000 and diluted loss per share of $0.26. Defendants represented that these, and other financial results contained in the Form 10-Q, fairly presented the Company's operations in the quarter, stating as follows in this regard:

In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows at July 31, 2004 and for all periods presented have been made. 31, 2004 and for all periods presented have been made.

39.     On November 23, 2004, H&R issued a press release announcing the following results for its second quarter of 2005:

KANSAS CITY, Mo. -- H&R Block Inc. (NYSE: HRB) today reported a $52.2 million net loss for the second quarter of its 2005 fiscal year, compared with earnings of $10.4 million in the second quarter last year.  Revenues totaled $539.3 million, a 5.2 percent decline from last year.  The company reported a loss of 32 cents per diluted share, compared with 6 cents of earnings last year. The decline in earnings was due primarily to decreased income in the mortgage segment.  An asset write-down in investment services and corporate development spending associated with new business initiatives also contributed to the earnings decline.  Historically, H&R Block has reported second quarter losses because of the seasonal nature of its tax and accounting businesses, although the company reported a profit in the second quarter of fiscal 2004.

"The competitive environment in the mortgage industry limited our pricing flexibility in the face of rising interest rates in the secondary market," said Chairman and Chief Executive Officer

Mark A. Ernst. "In view of industry-wide trends, we were satisfied with our levels of loan originations, which grew 2.7 percent compared with the second quarter last year, although operating margins did not improve as much as we had anticipated.

40.     On December 8, 2004, H&R filed its quarterly report with the SEC for the second quarter of 2005 Form 10-Q. The report was signed by defendants Ernst and Trubeck. For the quarter, defendants reported revenues of $539,255,000, net loss of $52,199,000and diluted loss per share of $0.32. Defendants represented that these, and other financial results contained in the Form 10-Q, fairly presented the Company's operations in the quarter, stating as follows in this regard:

> In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows at October 31, 2004 and for all periods presented have been made.

41.     On February 24, 2005, H&R Block issued a press release announcing the following results for its third quarter, ended January 31, 2005:

> KANSAS CITY, Mo. – H&R Block Inc. (NYSE:HRB) today reported net income of $91.7 million, or 55 cents per diluted share, for the third quarter ended Jan. 31, 2005.  Revenues in the third quarter were a record $1.03 billion, a 7.2 percent increase over the prior year's quarter.
>
> "A strong start to the tax season combined with solid performances from our mortgage and business services segments were highlights of a good quarter," said Mark A. Ernst, chairman and chief executive officer.  "I'm particularly pleased that the strategic actions taken in our tax and mortgage businesses are generating success in their respective markets."
>
> Early tax season results through Feb. 15 included a 10.6 percent increase in total tax preparation and related fees over the comparable period last year, paced by 4 percent retail client growth and a 6.3 percent increase in average fees per retail client.
>
> "The performance thus far is consistent with our expectations for a good tax filing season, supported by strong, new client acquisition, solid retention and increased client satisfaction with our services,"

14

Ernst said.

42.    On March 9, 2005, H&R filed its quarterly report with the SEC for the third quarter on Form 10-Q. The report was signed by defendants Ernst and Trubeck. For the quarter, defendants reported revenues of $1,032,007,000, net income of $91,692,000 and diluted earnings per share of $0.55. Defendants represented that these, and other financial results contained in the Form 10-Q, fairly presented the Company's operations in the quarter, stating as follows in this regard:

> In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows at January 31, 2005 and for all periods presented have been made.

43.    On June 8, 2005, H&R issued a press release reporting "record" results for its fiscal fourth quarter, ended April 30, 2005:

> KANSAS CITY, Mo. – H&R Block Inc. (NYSE:HRB) today reported record fourth quarter results, driven by revenue growth in each of its lines of business. Fourth quarter revenues increased 7.2 percent over the prior year's quarter to $2.4 billion. Revenues for the fiscal year were $4.4 billion, a 4.1 percent increase over the prior year.
>
> Consolidated net income for the fourth quarter increased 6.9 percent to $616.5 million. Consolidated net income for the fiscal year declined 10.5 percent to $635 million. Earnings per diluted share for the fourth quarter increased 13 percent to $3.66. For the fiscal year, earnings per diluted share decreased 4.1 percent to $3.76.
>
> "We finished our fiscal year on a very high note," said Mark A. Ernst, H&R Block's chairman and chief executive officer. "We successfully completed an important transition year in our tax business, saw our mortgage business returning to more normalized levels of profitability, finished a stellar year at RSM McGladrey, and achieved important changes in our investment services organization during the quarter.
>
> "For our U.S. tax operations, opening more than 1,200 new retail locations this year was an important first step in positioning us for

15

future client growth as these new locations   mature.

"Increasing our mortgage sales staff resulted in a 33 percent increase to loan origination volume for the year.  At the same time, we are lowering our cost of origination to succeed in a more competitive environment," Ernst said.

44.     On July 29, 2005, H&R filed with the SEC its annual report for the fiscal year ended April 30, 2005, on Form 10-K. The report was signed by defendants Ernst and Trubeck. In addition, as required by Section 302 of the Sarbanes-Oxley Act of 2002, the report contained certifications signed by Ernst and Trubeck that attested to the purported accuracy of the financial statements contained in the Form 10-K and that the Company's internal disclosure and financial reporting controls were effective, stating as follows:

1.     I have reviewed this annual report on Form 10-K of H&R Block, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial

16

reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

45.     In the Form 10-K, in the section of the annual report titled Management's Discussion and Analysis of Financial Condition and Results of Operations, defendants reported revenues of $4,420,019,000, net income of $635,857,000 and diluted earnings per share of $3.77, for the year. These results were reported "in accordance with generally accepted accounting principles ('GAAP')", according to the Form 10-K.

46.    The statements contained in the Company's press releases and SEC filings, as set forth above in ¶¶ 37-45, were materially false and misleading because they failed to disclose the following facts, among others:

a.    The Company had been improperly understating its taxes;

b.    H&R had been overstating its net income and earnings per share;

c.    the Company's financial results were not presented in accordance with GAAP;

d.    the Company's internal disclosure and financial reporting controls were not effective;

e.    H&R derived a material portion of its revenues from the deceptive marketing of its Express IRA product, by failing to disclose fees associated with the product. Such practices were inherently unsustainable, subjected H&R block to potential regulatory, civil and criminal liability, and posed an undisclosed risk to the Company and investors; and

f.    for the foregoing reasons, the Company's reported financial results deceived investors regarding the Company's true historical results and prospects.

47.    On September 1, 2005, H&R issued a press release announcing a 26% increase in revenues and 23% growth in earnings for its first fiscal quarter, ended July 31, 2005, reporting the following results:

> KANSAS CITY, Mo. – H&R Block Inc. (NYSE:HRB) today reported a 26 percent increase in first quarter revenue to $615 million, up from $486.6 million last year. A net loss of $28.3 million for the first quarter of fiscal 2006 was 23 percent better than the $36.7 million loss posted last year. The current year quarterly loss of 9 cents per diluted share compared favorably to a loss of 11 cents per share last year.
>
> "We've started the year with a strong first quarter, highlighted by double-digit revenue increases in all business segments," said Mark A. Ernst, chairman and chief executive officer. "Even with

18

our continuing investment in new tax offices, we saw an improvement over the loss posted last year."

48.    On September 8, 2005, H&R filed its quarterly report with the SEC for the first quarter on Form 10-Q. The report was signed by defendants Ernst and Trubeck. For the quarter, defendants reported revenues of $614,993,000, net loss of $28,324,000 and diluted loss per share of $0.09. Defendants represented that these, and other financial results contained in the Form 10-Q, fairly presented the Company's operations in the quarter, stating as follows in this regard:

> In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows at January 31, 2005 and for all periods presented have been made.

49.    On November 17, 2005, H&R issued a press release announcing results for its quarter ended October 31, 2005, reporting as follows:

> KANSAS CITY, Mo. – H&R Block Inc. (NYSE: HRB) today reported a net loss of $72.2 million, or 22 cents per share, for the second quarter of fiscal 2006 compared with       a loss of $49.9 million, or 15 cents per share, in the year-ago quarter.  Revenues in the quarter rose 14 percent to $620.4 million from $542.0 million in the prior-year period, with all business segments contributing to top-line growth.  "Good performance in our Tax Services, RSM McGladrey and Financial Advisors businesses was offset by weak mortgage earnings," said Mark A. Ernst, chairman and chief executive officer.  "Though mortgage originations and revenues were up during the second quarter, industry pricing pressure and rising funding rates combined to limit mortgage earnings."

50.    On December 12, 2005, H&R filed its quarterly report with the SEC on Form 10-Q for its third quarter ended October 31, 2005. The report was signed by defendants Ernst and Trubeck. For the quarter, defendants reported revenues of $605,043,000, net loss of $86,275,000 and diluted loss per share of $0.26. Defendants represented that these, and other

financial results contained in the Form 10-Q, fairly presented the Company's operations in the quarter, stating as follows in this regard:

> In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows at January 31, 2005 and for all periods presented have been made.

51.    The statements contained in the Company's press releases and SEC filings, as set forth above in ¶¶ 47-50, were materially false and misleading because they failed to disclose the following facts, among others:

a.    The Company had been improperly understating its taxes;

b.    H&R had been overstating its net income and earnings per share;

c.    the Company's financial results were not presented in accordance with GAAP;

d.    the Company's internal disclosure and financial reporting controls were not effective;

e.    H&R derived a material portion of its revenues from the deceptive marketing of its Express IRA product, by failing to disclose fees associated with the product. Such practices were inherently unsustainable, subjected H&R block to potential regulatory, civil and criminal liability, and posed an undisclosed risk to the Company and investors; and

f.    for the foregoing reasons, the Company's reported financial results deceived investors regarding the Company's true historical results and prospects.

## THE TRUTH BEGINS TO EMERGE

52.    On February 23, 2006, after the close of ordinary trading, H&R issued a press release announcing that it would restate previously issued financial reports for 2004 and

2005, because it understated previously reported taxes by applying the wrong state income tax rate, stating as follows in relevant part:

> As part of its ongoing work to remediate control weaknesses in its corporate tax function, the company said that it will restate its results for fiscal years 2005 and 2004, as well as previously reported quarterly results for fiscal 2006. The restatement pertains principally to errors in determining the company's state effective income tax rate, resulting in a cumulative understatement of its state income tax liability of approximately $32 million as of April 30, 2005. The company estimates that the restatement will result in a 7-cent decrease in earnings per share in fiscal 2005 and a 2-cent decrease in earnings per share in fiscal 2004. The company has not completed its analysis of the restatement adjustments, and, accordingly, the effects of the restatement on all prior periods are preliminary and subject to change. These adjustments are also being reviewed with the company's registered public accounting firm. The company will report in amended filings with the Securities and Exchange Commission the further restatement of results for fiscal years 2005 and 2004, and restatements for the first two quarters of fiscal 2006 for the income tax adjustments.

53.     In response to this announcement, the price of H&R common stock dropped by 8.6% in one day, from $25.19 per share on February 23, 2006 to $23.01 per share on February 24, 2006, on unusually heavy trading volume.

54.     Then, on March 15, 2006, the office of the New York Attorney General announced the filing of a civil complaint, in New York State Supreme Court, alleging that H&R failed to disclose fees and expenses on the Company's "Express IRA" product to approximately 500,000 clients that signed up for the account. According to the lawsuit, the retirement accounts at issue generated more in fees for H&R than fees for the clients.

55.     In response to this announcement, the price of H&R common stock dropped by $1.37 per share, or 6.2%, to $20.63 per share, on unusually heavy trading volume.

## UNDISCLOSED ADVERSE INFORMATION NEGATIVELY IMPACTED THE MARKET FOR H&R SHARES

56.     The market for H&R's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, H&R's common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until at least the end of the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired H&R securities relying upon the integrity of the market price of H&R's securities and market information relating to H&R, and have been damaged thereby.

57.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of H&R's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

58.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about H&R's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of H&R and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other

22

members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

59.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by plaintiff and the Class.

60.     During the Class Period, plaintiff and the Class purchased securities of H&R at artificially inflated prices and were damaged thereby. The price of H&R common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## ADDITIONAL SCIENTER ALLEGATIONS

61.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth above in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding H&R, their control over, and/or receipt and/or modification of H&R's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning H&R, participated in the fraudulent scheme alleged herein.

62.     The inherent deficiencies of the Express IRA product was common knowledge to H&R upper management. The Attorney General's complaint references an email

from defendant Ernst to an H&R product manager, which comments on unease by certain H&R

employees with the product. In relevant part, the email states as follows:

> The attached note (from a District Manager) reflects the general sense that I think exi[s]ts
> — that ExpressIRA is the right thing for our clients, **but the product is designed to nickel
> and dime clients to the point where our field people don';t [sic] feel as good about the
> product as they should**.  You should seriously look at whether, with a bank product
> design, we can eliminate the fees so that our people feel better about the offer.[Emphasis
> added].

63.     Defendants were motivated to engage in the wrongdoing alleged herein so

that H&R insiders, including defendant Yabuki, could sell their personally held H&R stock at

artificially inflated prices. During the Class Period, H&R insiders sold a total of 1,941,118 shares

of H&R stock for proceeds of $50,610,601, as follows: [1]

| Thomas Block: Director | | | | |
|---|---|---|---|---|
| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
| 3/1/2005 | 3,000 | 26.50 | 79,500.00 | |
| 3/1/2005 | 200 | 26.50 | 5,300.00 | |
| 3/1/2005 | 200 | 26.50 | 5,300.00 | |
| 4/1/2005 | 3,000 | 25.35 | 76,050.00 | |
| 4/1/2005 | 200 | 25.35 | 5,070.00 | |
| 4/1/2005 | 200 | 25.35 | 5,070.00 | |
| 5/2/2005 | 3,000 | 24.91 | 74,745.00 | |
| 5/2/2005 | 200 | 24.91 | 4,983.00 | |
| 5/2/2005 | 200 | 24.91 | 4,983.00 | |
| 6/1/2005 | 3,000 | 24.99 | 74,970.00 | |
| 6/1/2005 | 200 | 24.99 | 4,998.00 | |
| 6/1/2005 | 200 | 24.99 | 4,998.00 | |
| 7/1/2005 | 6,800 | 29.25 | 198,900.00 | |
| 8/1/2005 | 6,800 | 28.30 | 192,440.00 | |
| 9/1/2005 | 1,500 | 26.84 | 40,260.00 | |
| 9/1/2005 | 100 | 26.84 | 2,684.00 | |
| 9/1/2005 | 100 | 26.84 | 2,684.00 | |
| 11/18/2005 | 2,500 | 25.00 | 62,500.00 | |
| 11/18/2005 | 500 | 25.36 | 12,680.00 | |
| 11/18/2005 | 200 | 25.00 | 5,000.00 | |

[1] All shares sold and Price/Share figures are adjusted for a 2 for 1 stock split on August 23, 2005.

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 11/18/2005 | 200 | 25.00 | 5,000.00 | |
| 12/1/2005 | 1,500 | 25.27 | 37,905.00 | |
| 12/1/2005 | 100 | 25.27 | 2,527.00 | |
| 12/1/2005 | 100 | 25.27 | 2,527.00 | |
| 1/3/2006 | 1,000 | 24.52 | 24,520.00 | |
| 1/3/2006 | 100 | 24.52 | 2,452.00 | |
| 1/3/2006 | 100 | 24.52 | 2,452.00 | |
| 2/1/2006 | 1,000 | 24.33 | 24,330.00 | |
| 2/1/2006 | 100 | 24.33 | 2,433.00 | |
| 2/1/2006 | 100 | 24.33 | 2,433.00 | |
| | | | | |
| | **36,400** | | **969,694.00** | |

**Melanie Coleman: Former VP/Controller**

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 3/14/2005 | 2,600 | 26.05 | 67,743.00 | |
| 3/14/2005 | 2,534 | 26.06 | 66,041.11 | |
| 3/14/2005 | 200 | 26.08 | 5,216.00 | |
| 7/6/2005 | 17,334 | 29.20 | 506,152.80 | |
| | | | | |
| | **22,668** | | **645,152.91** | |

**Robert Dubrish: President & CEO**
**of Option One Mortgage Corp (Subsidiary)**

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 7/7/2005 | **280,000** | 29.30 | **8,202,600.00** | |

**Donna Ecton: Director**

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 9/13/2005 | 2,100 | 24.71 | 51,891.00 | |
| 9/13/2005 | 600 | 24.74 | 14,844.00 | |
| 9/13/2005 | 200 | 24.72 | 4,944.00 | |
| 9/13/2005 | 100 | 24.75 | 2,475.00 | |
| | | | | |
| | **3,000** | | **74,154.00** | |

**Linda McDonough: VP**

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 6/10/2005 | **20,054** | 56.20 | **1,127,034.80** | |

**Timothy Mertz: VP**

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 6/13/2005 | 2,600 | 28.10 | 730,600.00 | |
| 7/7/2005 | 26,128 | 29.30 | 749,952.00 | |
| | **28,728** | | **1,480,552.00** | |

**Robert Weinberger: VP**

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 6/24/2005 | 40,000 | 29.09 | 1,163,400.00 | |
| 12/29/2005 | 60,000 | 24.35 | 1,460,820.00 | |
| | **100,000** | | **2,624,220.00** | |

**Bret Wilson: VP/Secretary**

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 6/16/2005 | 32,000 | 28.90 | 924,800.00 | |
| 11/21/2005 | 24,000 | 24.94 | 598,656.00 | |
| 1/11/2006 | 17,200 | 25.52 | 438,944.00 | |
| | **73,200** | | **1,962,400.00** | |

**Jeffery Yabuki: Former COO and EVP**

| Transaction Date | # Shares Sold | Price($)/Share | $ Proceeds | |
|---|---|---|---|---|
| 11/18/2005 | 674,118 | 24.33 | 16,398,392.23 | |
| 11/18/2005 | 671,118 | 24.33 | 16,325,415.13 | |
| 11/21/2005 | 20,000 | 25.01 | 500,236.00 | |
| 11/22/2005 | 4,332 | 24.70 | 107,000.40 | |
| 11/23/2005 | 2,500 | 26.10 | 65,250.00 | |
| 11/28/2005 | 5,000 | 25.70 | 128,500.00 | |
| | **1,377,068** | | **33,524,793.76** | |

## FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT AND RULE 10b-5
### PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     During the Class Period, H&R and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of H&R's securities; and (iii) cause plaintiff and other members of the Class to purchase H&R's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

66.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for H&R's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

67.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the

27

integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R.

Sections 210.01 *et seq.*) and Regulation S-K (17 C.F.R. Sections 229.10 *et seq.*) and other SEC

regulations, including accurate and truthful information with respect to the Company's

operations, financial condition and earnings so that the market price of the Company's securities

would be based on truthful, complete and accurate information.

68.     H&R and the Individual Defendants, individually and in concert, directly

and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material

information about the business, operations and future prospects of H&R as specified herein.

69.     These defendants employed devices, schemes and artifices to defraud,

while in possession of material adverse non-public information and engaged in acts, practices,

and a course of conduct as alleged herein in an effort to assure investors of H&R's value and

performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state material

facts necessary in order to make the statements made about H&R and its business operations and

future prospects in the light of the circumstances under which they were made, not misleading,

as set forth more particularly herein, and engaged in transactions, practices and a course of

business that operated as a fraud and deceit upon the purchasers of H&R's securities during the

Class Period.

70.     Each of the Individual Defendants' primary liability, and controlling

person liability, arises from the following facts: (i) the Individual Defendants were high-level

executives and/or directors at the Company during the Class Period and members of the

Company's management team or had control thereof; (ii) each of these defendants, by virtue of

his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

71.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing H&R's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

72.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of H&R's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of H&R's publicly traded securities were artificially inflated, and relying directly or

indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired H&R securities during the Class Period at artificially high prices and were damaged thereby.

73.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of H&R, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their H&R securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

74.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

## VIOLATION OF SECTION 20(a) OF
## THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of H&R within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.    As set forth above, H&R and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

80.    Determining that this action is a proper class action and appointing plaintiff as Lead Plaintiff and its counsel as Lead Counsel for the Class and certifying it as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

81.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

82.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

83.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  March 21, 2006

**MILBERG WEISS BERSHAD & SCHULMAN LLP**

By: _____

Steven G. Schulman  (SS-2561)
Peter E. Seidman (PS-8769)
Andrei V. Rado (AR-3724)
One Pennsylvania Plaza - 49th Floor
New York, NY  10119-0165
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

**KROLL HEINMAN GIBLIN**
Vincent M. Giblin
99 Wood Avenue South, Suite 307
Iselin, NJ  08830
Tel: (732) 491-2100

**Plaintiff's Counsel**

## CERTIFICATION OF PLAINTIFF

I, George R. Laufenberg, on behalf of the NEW JERSEY CARPENTERS PENSION FUND, certify that:

1. I have reviewed the complaint and authorized its filing.

2. As Administrative Manager of the NEW JERSEY CARPENTERS PENSION FUND, I have been duly authorized by the NEW JERSEY CARPENTERS PENSION FUND to commence litigation against H&R Block and other defendants.

3. NEW JERSEY CARPENTERS PENSION FUND did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

4. NEW JERSEY CARPENTERS PENSION FUND is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. NEW JERSEY CARPENTERS PENSION FUND will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. NEW JERSEY CARPENTERS PENSION FUND understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party or Lead Plaintiff.

7. NEW JERSEY CARPENTERS PENSION FUND has listed below all its transactions in the securities of H&R Block(NYSE: HRB) during the Class Period specified in the complaint as follows:

| Type of Security (Common Stock, Preferred Stock, Calls, Puts or Bonds) | Purchase/Acquisition or Sale/Disposition | Quantity | Trade Date (mm/dd/yy) | Price per Share/Security ($) |
|---|---|---|---|---|
| See attached Schedule A | | | | |

8. During the three years prior to the date of this Certification, NEW JERSEY CARPENTERS PENSION FUND has not sought to serve and has not served as a representative party for a class in an action filed under the federal securities laws except as described below:

> In re Biogen Idec., Inc., Sec. Litig., No. 05-CV-10400 (D. Mass. filed Mar. 2, 2005)
> In re Forest Labs., Inc. Sec. Litig., No. 05-CV-2827 (S.D.N.Y. filed Mar. 11, 2005)
> In re Doral Fin. Corp. Sec. Litig., No. 05-MD-1706 (S.D.N.Y. 2005)
> In re FBR Inc. Sec. Litig., No. 05-CV-4617 (S.D.N.Y. filed May 11, 2005)
> In re Boston Scientific Corp. Sec. Litig., No. 05-CV-11934 (D. Mass. filed Sept. 23, 2005)
> New Jersey Carpenters Pension Fund v. Diebold, Inc., No. 06-CV-0040 (N.D. Ohio filed Jan. 6, 2006) (named plaintiff)

> and has been appointed lead or co-lead in Biogen Idec, Inc.

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this _20th_ day of _March_, 2006

NEW JERSEY CARPENTERS PENSION FUND

George R. Laufenberg
Administrative Manager

### Schedule A
### New Jersey Carpenters Pension Fund
### transactions in H+R Block (NYSE: HRB)

| Purchase(s): | DATE | SHARES | COST |
|---|---|---|---|
| | 04/28/05 | 500 | 50.4413 |
| | 05/12/05 | 400 | 50.2753 |
| | 05/31/05 | 400 | 50.1578 |
| Shares received in split | 08/23/05 | 1,000 | 0.0000 |

| Sale(s): | | | |
|---|---|---|---|
| | 08/16/05 | 300 | 65.5899 |
| | 10/14/05 | 800 | 23.1408 |
| | 11/01/05 | 700 | 24.7481 |